C. J. CHRISTIENSON, Respondent, v. THE RIO
GRANDE WESTERN RAILWAY COMPANY,
a Corporation, Appellant.[1]

### No. 1499.   (74 Pac. 876.)

1. **Master and Servant: Injuries to Servant: Assumption of
   Risk.**

   Where plaintiff entered defendant's employ as a section hand,
   and went to work voluntarily in a gravel pit, in which the
   gravel was got out by plaintiff and his fellow-servants un-
   dermining the bank so that the gravel would fall into the
   pit, which work he knew was dangerous, and he was per-
   fectly familiar with the bank, its conditions and surround-
   ings, and with the character of the materials of which it
   was composed, and he knew at the time of his injury by
   the falling of the bank that it had been undermined at the
   particular place where he was working, and realized that
   the bank was liable to fall at any minute, he assumed the
   risk of his injury.

2. **Same: Safe Place to Work.**

   Where a servant assents to occupy the place prepared for him
   in which to work, and incur all the dangers incident thereto,
   having sufficient intelligence to enable him to comprehend
   such dangers, such assent dispenses with the performance
   of the master's duty to furnish the servant with a safe
   place in which to work.[2]

(Decided December 29, 1903.)

Appeal from the Fourth District Court, Utah County.
—*Hon. J. E. Booth,* Judge.

Action to recover damages alleged to have been
caused by the negligence of the defendant. From a
judgment in favor of the plaintiff, the defendant ap-
pealed.

REVERSED.

[1] Allen v. Logan City, 10 Utah 279, 37 Pac. 496, distinguished
and criticised.
[2] Anderson v. Daly Min. Co., 16 Utah 28, 50 Pac. 815.

*Messrs. Sutherland, Van Cott & Allison* and *Samuel R. Thurman, Esq.*, for appellant.

*Morris Sommer, Esq.*, and *D. S. Truman, Esq.*, for respondent.

### STATEMENT OF FACTS.

The plaintiff brought this action to recover damages for personal injuries which he alleges he received through the negligence of the defendant. From the evidence it appears, substantially, that the plaintiff is 43 years of age, and for many years prior to and at the time of the accident which caused his injuries was in the employ of the defendant as a section hand. When he received his injuries, which was on January 29, 1901, he was working at a gravel bank at Santaquin, on the defendant's line of railway, shoveling gravel into a car provided by the company for that purpose. He had worked there in that capacity at different times since the year 1892. The bank was about 12 or 15 feet high, and contained different layers of dirt, cement, and gravel. At the place where he was working, where the accident happened, the thickness of the gravel, from the bottom of the bank to the cement, was about six feet, the cement was about two feet, and the dirt or ground on top of the cement about four feet thick, making the bank about twelve feet high at that point. The method employed to get the gravel down was to undermine the bank with pick and shovel, and then break it down from the top when it did not fall of its own weight. At the time of the accident, the bank had been undermined about two feet, was top-heavy, and broke away and fell of its own accord, causing the injuries of which complaint is made. The plaintiff was familiar with the method of loosening the gravel, and had on previous occasions, with other fellow workmen, undermined the bank for the same purpose. He was familiar with the bank; knew the mate-

rial of which it was composed; was aware, while working there before and when the accident occurred, that the bank was undermined, that it was dangerous and might fall at any minute, and that either himself or his fellow workmen, or both, had undermined it. He was a man of experience in that business, of ordinary intelligence, and entirely familiar with all the surrounding conditions. At the time of the injury he was shoveling gravel upon the car at a place of his own selection. He worked there in November and December, 1900, then went to Ogden for several weeks, and when he returned he resumed work at the gravel bank.

Respecting these matters, the plaintiff himself, among other things, testified: "During the time that we were working there, we undermined the bank some right along, and I did as much as the rest. It was undermined in places, and then it would cave down, first at one place, then at another, and so on, so that at one time or another during the work it was undermined, all the way along from one end to the other. The men did the undermining, and I was one of them; the pick being the main thing used for this purpose. We undermined it in order to remove the support. There were places at the upper end where the bank would be likely to fall if it stood perpendicular without being undermined, the gravel being so loose that it would not hold its own weight up, but at the point where I was hurt the bank would not fall if it stood perpendicular. I knew this, and, when I started to undermine it, I did so in order to get it to fall at some time or another, I knew that, the more I undermined it, the more likely the bank would fall. . . . Whenever the track was close up to the bank, we would go up on top of the bank, and start to pick from the top, and throw it down. We would pick down through the cement, and get it out. I did a good deal of this myself, so that I knew pretty well the kind of material of which the bank was composed. I knew the kind of material of which the bank was composed at the time I was hurt, and also knew it at the time I was working there in November

and December.'' Speaking of what he and others did just prior to the accident, the witness said: ''He (foreman) didn't tell us how to load the car, nor how to do our work, nor where to station ourselves. We went down to the car, picked up our shovels, and selected our own places; Searles and myself being on one side of the car and the rest of the men, five in number, on the other. I was attending to my work, bending down shoveling. I did watch the bank, however, to see if there should be anything to indicate a fall. I didn't think about its falling, but I wanted to be on the lookout. When a bank is undermined, you can not tell but that it may fall any minute. I appreciated this. Somebody had told me that when a bank was undermined it might fall any minute. Of course, this was the first time I had ever worked in it. I would occasionally take a look at the bank to see if there were any signs of falling, so as to be prepared to run and get out of the way if it started to come. I fully appreciated that there was some danger that it might fall, and I wanted to be ready to run if it did. I didn't have any idea that it would fall.''

The witness Gurley, who was at work with the plaintiff when the accident occurred, among other things, testified: ''When I went to work here after dinner, it was on the same side of the car as Mr. Christienson and Mr. Searles. We all went down together, our tools being already there, for we had left them when we went to dinner. When we walked down there, we selected our places to go to work, and I think Mr. Christienson selected his. Seven of us went there and distributed ourselves around the place as we pleased. As I stood there I saw the bank, and it looked dangerous to me, because I thought it was undermined too far. It was undermined from two to three feet. I watched it pretty closely while I was working there, for I expected the bank to fall in, so that if it started to fall I was going to run. When it did fall it was for a distance of about thirty feet along the face of the bank.

It didn't fall up to where I was, but pretty close to me. Searles ran and got out of the way. . . . The conditions there on the bank were plain to be seen. Anybody could look at it and see that it was undermined, and that the bank up here had no direct support under it. Any one could see this who stood there and looked at the bank. I looked at the bank, and saw that it was dangerous, and concluded to stay there, and work and watch it, and take my chances. Mr. Christienson, being right by my side, could see the danger just as I did. Everything that led me to conclude that it was dangerous was open, obvious, and plain to be seen with the eye. Anybody could see it.'' Testimony to the same effect was given by other witnesses. When the plaintiff rested, the defendant interposed a motion for a nonsuit, which was denied; and, the defendant offering no evidence, the case was submitted to the jury, whereupon a verdict was returned in favor of the plaintiff for the sum of $4,000. Thereafter, the plaintiff having consented, at the instance of the court to a reduction of the amount of the verdict to $3,000, judgment was entered accordingly, and the defendant appealed.

BARTCH, J., after a statement of facts as above, delivered the opinion of the court.

The appellant, in the first instance, insists that the court erred in denying the defendant's motion for a nonsuit. The motion was based, *inter alia,* on the ground that the plaintiff, in entering upon the performance of the labor in which he was engaged at the time of the accident, assumed the risks of the injuries he sustained. It is urged that the undermining and consequent falling of the bank was a part of the employment, and that the company, under the circumstances, was not liable for injuries received by the employee from the falling earth. The respondent contends that the company was bound to furnish the plaintiff a safe place to work, that he did not assume the risk of the caving of the bank, and that the assumption

of risk was not a question of law for the court, but one of fact for the jury.

We think, under the evidence in this case, the motion for a nonsuit was well taken, and that the contention of the respondent is not tenable. The plaintiff has failed to show his employer guilty of actionable negligence. He himself had full knowledge of the premises, and was cognizant of the methods employed in the service, and of the conditions existing there. This is manifest from the evidence. It is true, the general rule is that, where a master employs a servant, he must exercise ordinary care to furnish the servant a reasonably safe place in which to perform the service, and a failure to do so will render the master liable for any injury the servant may receive because of such failure; but such rule has no application to a case like the one disclosed by the facts and circumstances in evidence herein, where the very nature of the service is dangerous, and where its dangerous character is obvious and is equally within the knowledge of the servant and the master, and is comprehended by the servant. Where one engages in an employment obviously dangerous, and knows the manner in which it is to be carried on, is familiar with the conditions and surroundings, and is aware that his own work and that of his fellow workmen will constantly change its character, rendering it alternately safe and dangerous, he assumes the risks incident to the employment. This case clearly falls within such rule. The evidence shows that the gravel bank at the place where the accident happened was at that time obviously dangerous; that plaintiff selected that particular place, where he was at work at the time of the injury, of his own choice; that he was familiar with the bank, its conditions and surroundings, and acquainted with the character of the materials of which it was composed; that he knew the bank was undermined at that particular place where he was working; that he observed the bank, and realized that he was at a dangerous place; that he was aware that the

bank might cave and fall at any moment; that he had
worked at the bank in the same capacity on numerous
previous occasions, and was as familiar with it and the
manner in which these operations were carried on as
his employer, if not more so; that he was aware that
his own work and that of his colaborers rendered the
bank dangerous, and of a character continually chang-
ing; and that he is a man of experience in that busi-
ness, and of ordinary intelligence. Where such facts as
these are established by the evidence, no court can
hold the employer liable for injuries sustained by the
employee. Nor, under the conditions shown to have
existed at that bank, can an employer be required to
keep the place absolutely safe. To so require would
be an interference with a usual mode of conducting a
private business, which mode, although dangerous, is
not of such a character that the employee can not avoid
injury by the exercise of ordinary care and prudence.
Such an interference with a private enterprise would
be contrary to the well-settled law that an employer
may carry on his business in the way he may choose,
although another method would be less dangerous, and,
if the employee knows the hazards incident to the busi-
ness in the manner in which it is carried on, and con-
tinues in the employment, he assumes the risks of the
more dangerous method. In this case a part of the
business was to undermine the bank for the purpose of
removing its support so as to cause the gravel to break
away and fall down. The breaking away and falling
of the gravel was simply the result of natural laws, and
the plaintiff, as well as his associates, knew or ought
to have known just as much about the hazards con-
nected with such business, and about such manner of
conducting it, as did the foreman or the employer. The
employer, in the conduct of the operations, simply took
advantage of the laws of gravitation, with which the
plaintiff, being a man of usual intelligence, must be
presumed to have been cognizant. He, having engaged
in such service, and consented to the manner in which

it was performed, aware of the conditions of the bank and the dangers incident to the employment, and having, of his own volition, undertaken to perform the service at the place of injury, must be held to have assumed the ordinary risks of injury incident to that that service, including the risk of the injuries he received on the occasion in question, and can not now be heard to complain.

We are aware of no case where, under such facts and circumstances as are disclosed by this record, a recovery by an employee against the employer was permitted by an appellate court. In Naylor v. C. & N. W. Ry. Co., 53 Wis. 661, 11 N. W. 24—a case quite similar to the one at bar, except that the superintendent of the work directed the plaintiff where to work, while here the plaintiff chose his own place—Mr. Justice Lyon, speaking for the court, said: "Applied to this case, the law is that if the plaintiff, when at work in the gravel bank on the day he was injured, fully knew the hazards of the work—if he knew he was at work in a dangerous place, and that the bank of earth above was liable to fall upon him—he can not recover in this action. In that case it is quite immaterial that the work might have been made safe by detaching earth from the bank above him, or in any other manner. Having such knowledge, his implied contract was that he assumed the hazards of the employment incident to the business as it was conducted." So, in Swanson v. Great Northern Ry. Co., 68 Minn. 184, 70 N. W. 978, it was said: "It is the universal rule that, in performing the duties of his place, a servant is bound to take notice of the ordinary operation of familiar natural laws, and to govern himself accordingly. Failing to do so, he takes the consequences. He can not charge such consequences upon the master, when he can see that which is open and apparent to a person of ordinary intelligence. This rule has been referred to and applied in this court on several occasions." In Simmons v. C. & T. R. Co., 110 Ill. 340, it was observed: "If a servant,

knowing the hazards of his employment, as the business is conducted, is injured while engaged therein, he can not maintain an action against the master for the injury merely on the ground that there was a safer mode in which the business might have been conducted, the adoption of which would have prevented the injury." In Griffin v. O. & M. Ry. Co., 124 Ind. 326, 24 N. E. 888, it was said: "It has been too long settled to now admit of controversy that when a servant enters upon an employment which is, from its nature, necessarily hazardous, he assumes the usual risks and perils of the service. In such cases it is held that there is an implied contract on the part of the servant to take all the risks fairly incident to the service, and to waive any right of action against the master resulting from such risk." Likewise, in Sullivan v. India M. Co., 113 Mass. 396, the law was thus stated: "When the servant assents to occupy the place prepared for him, and incur the dangers to which he will be exposed thereby, having sufficient intelligence and knowledge to enable him to comprehend them, it is not a question whether such place might, with reasonable care, and by a reasonable expense, have been made safe. His assent has dispensed with the performance on the part of the master of the duty to make it so. Having consented to serve in the way and manner in which the business was being conducted, he has no proper ground of complaint, even if reasonable precautions have been neglected." Pederson v. City of Rushford, 41 Minn. 289, 42 N. W. 1063; Rasmussen v. C., R. I. & P. R. Co., 65 Iowa 236, 21 N. W. 583; Reiter v. Winona & St. P. R. Co. (Minn.) 75 N. W. 219; Regan v. Palo (N. J. Sup.) 41 Atl. 364; Songstad v. B., C. R. & N. R. Co. (Dak.) 41 N. W. 755; Swanson v. City of L., 134 Ind. 625, 33 N. E. 1033; G. H. & S. A. Ry. Co. v. Lempe, 59 Tex. 19; Olson v. McMullen, 34 Minn. 94, 24 N. W. 318; Larich v. Moies, (R. I.) 28 Atl. 661; Anderson v. Daly Min. Co., 16 Utah 28, 50 Pac. 815; Chisney v. Pennsylvania S. P. Co. (Pa.), 49 Atl. 309; Anderson v. Winston (C. C.), 31 Fed.

528; Gulf, C. & S. F. Ry. Co. v. Jackson, 65 Fed. 48, 12 C. C. A. 507; City of M. v. Lundin, 58 Fed. 525, 7 C. C. A. 344.

The appellant has cited Allen v. Logan City, 10 Utah 279, 37 Pac. 496, in support of its contention in this case.   But we do not base our decision herein upon that case.   There the plaintiff was summoned under the law to work out his poll tax, and, obeying the summons, placed himself in the hands of an officer of the defendant who had charge of the work, willing to obey his directions.   He had worked at that bank but two half days, when, on the day of the accident, the defendant assigned him to a dangerous position, where he had not been accustomed to work, and failed to inform him of the existence of cracks on top of the bank, which had been occasioned by the explosion of giant powder by other laborers on the previous day, and which could not be observed from the place of work, and of the existence of which, as well as of the blasting, the plaintiff was in total ignorance, but the defendant was aware of the same.   While the plaintiff was at work, ignorant of the condition of the bank on top, and which condition was not open to his view, the bank broke away along the cracks, fell, and injured him.   We are of the opinion that to hold that, under such circumstances as those, he could not recover, was extending the doctrine of assumed risks too far, and therefore refrain from recognizing that decision as controlling authority herein.

The conclusion, under the facts and circumstances in evidence in this case, is irresistible that the motion for a nonsuit ought to have been sustained.   It seems the judge before whom the case was tried, and who heard and observed the witnesses on the stand, had been forced to the same conviction, when, in rendering his opinion on the motion, he said:  ''Personally, I regard it as an accident, pure and simple, for which nobody was responsible.''   We do not deem it important to pass upon any other question presented.

. The case must be reversed, with costs, and the

cause remanded, with directions to the court below to set aside its judgment, and enter judgment on the motion for nonsuit in accordance with this opinion. It is so ordered.

BASKIN, C. J., and McCARTY, J., concur.