EPHRAIM DUNN, Respondent, v. THE OREGON SHORT LINE RAILROAD COMPANY, a Corporation, Appellant.

No. 1582.   (80 Pac. 311.)

**MASTER AND SERVANT: Negligence: Assumption of Risk.**

> A section gang, to facilitate the loading of ties on a car, which they were about to do, made a temporary platform at the end of the car, by placing ties lengthwise the track, between the rails, and extending two planks from the ground to such ties. After one of the crew had been loading the ties for two hours, he was injured while pushing a tie into the car. either by the slipping of one of the planks when he was on it, or by his slipping after stepping onto the ties between the rails, which were wet and muddy. *Held,* that plaintiff had assumed the risk.[1]
> STRAUP, J., dissenting.

[1] Higgins v. Railroad Co., 72 Pac. 690, 26 Utah, 165; Christienson v. Railroad Co., 27 Utah, 132, 74 Pac. 876.

(Decided March 15, 1905.)

Appeal from the First District Court, Box Elder County.—*Hon. C. H. Hart,* Judge.

Action to recover damages for personal injuries. From a judgment in favor of the plaintiff the defendant appealed.

AFFIRMED.

*P. L. Williams, Esq.,* and *Geo. H. Smith, Esq.,* for appellant.

*Lindsay R. Rogers, Esq.,* and *Jas. S. Perry, Esq.,* for respondent.

### STATEMENT OF FACTS.

In this suit the plaintiff seeks to recover damages for personal injuries which he claims he received through the negligence of the defendant. The answer denies the negligence charged, and alleges contributory negligence and assumed risk on the part of the plaintiff. As a witness in his own behalf, the plaintiff, among other things, testified, in substance, that on the morning of April 23, 1902, when he received the injury of which he complains, he was in the employ of the defendant as a section hand, and had been so employed for some time previous; that on the morning in question, after performing some other duties, he joined the rest of the section gang at Willard Station, where the men, under the direction of the foreman, were engaged in loading ties from the ground into a coal car, by putting them in at the end of the car, the end gate having been removed; that at the end of the car the men had constructed a platform (a temporary arrangement devised by them for the purpose of making the loading more convenient and easier, although the ties could have been loaded

without it) ; that the platform consisted of six or seven ties laid lengthwise between the rails of the track, in front of the end of the car, and two planks, one end of each resting on the ties, without being nailed, and the other on the ground near the pile of ties (the planks, which were 12 feet long, 3 inches thick, and 12 inches wide, forming a runway, of an easy grade, for the men in carrying the ties to the car for the purpose of loading) ; that the planks taken for that purpose were of the ordinary crossing planks used along the road; that the floor of the car was about 3 feet from the ground; that when he got there to load ties the platform had already been constructed, and he paid no particular attention to it, but saw it was there, and could observe it; that sometimes one man, and sometimes two, would carry one tie upon the platform to the car, and hand it to men on the car to load; that it had rained during the night and early morning, and the ties and plank were wet, and mud had been carried upon the planks and platform by walking upon them; that he observed this condition of the platform as he walked up and down on it, and felt the mud under his feet; that the platform was plainly to be seen, and he could observe it; that he had been carrying ties about two hours before the accident happened; that at the time of the accident he and another workman were carrying a tie; and that the other workman walked ahead and placed his end upon the car, when the plaintiff, endeavoring to push the tie further up to the man on the car, fell and injured himself. Respecting his fall and injury, the plaintiff says his feet were still on the planks, which, as he was pushing the tie, slipped backward, and caused him to fall forward, and that in falling he struck his chin either on the edge of the tie or on the end of the car, and that the end of the tie pinched off the fleshy part of the end of the index finger of his left hand. The foreman, who was an eyewitness to the accident, testified that the planks did not slip, and that the plaintiff was standing upon the ties beyond the planks, pushing the tie up, when he

slipped and fell. In describing the injury on his chin, the plaintiff said: "My chin was scratched and bruised a little, and down my neck was also scraped slightly. The skin was just scratched a little. After I got home, some time after this accident, my chin and neck became discolored and swollen." Respecting what occurred when, after the accident, he called on Dr. Taylor, the local surgeon of the defendant, the plaintiff testified: "On the first visit the only thing needed was to dress my finger. I called his attention to my chin. When I called his attention to my neck, he said that was not anything, and did not think it would hurt me much." The plaintiff further testified: "I first went to see Dr. Taylor on the 23d of April, 1902. I think I only went to see him about my condition during a period of about three weeks. After I quit going to see Dr. Taylor the swelling and discoloration and everything else on my neck disappeared. This scar on my neck and this running sore near the Adam's apple never developed and never discharged or became sore at all until long after I quit going to see Dr. Taylor. I cannot remember just exactly when this sore on my neck did come. Not long after I quit going to see Dr. Taylor my neck swelled up quite large, and the swelling disappeared, and then about six weeks after the accident I first noticed this sore develop on my throat. The sore came some little time before it commenced to discharge. This condition of my throat developed something like two months after the original swelling and discoloration had gone away." It also appears from the evidence of the several physicians that the injury was of a temporary character, and that the fistula on his throat can be cured by a simple surgical operation, concerning which Dr. Conroy, an expert witness for plaintiff, said: "The operation would not be a vital one. All that it would require would be that degree of skill and competency that we would expect of the average physician, who has given careful study of the ordinary, approved character and skill in

his profession." There appears to be no evidence show-ing that the fistula was directly traceable to the injury. Under this and other testimony of similar import, the jury returned a verdict in favor of the plaintiff for the sum of $4,500, and judgment was entered accordingly.

The case having been stated, as above, BARTCH, C. J., delivered the opinion of the court.

At the time of the submission of the case to the jury the defense, *inter alia*, requested the court to charge as follows: "The court charges you in this case that, as matter of law, the plaintiff is not entitled to recover, and your verdict should therefore be for the defendant." This request was refused, and the action of the court in the premises has been assigned as error.

The appellant contends that the entire record pre-sented a case involving the principle of assumed risk of the servant, and showed such a state of facts as made it the duty of the court to so charge the jury, and we are of the opinion that this contention is well founded. Upon careful examination of the evidence, the conclu-sion seems irresistible that the plaintiff has shown no right of recovery. We are unable to perceive, from the proof, wherein the company was guilty of actionable negligence. The plaintiff's own testimony fails to show it. The platform was but a simple arrangement, con-structed by the men who were to load the car, for their own convenience, out of material not furnished by the company for such purpose. It was only a temporary thing, of their own invention, to enable them to perform their work more easily. The company had furnished no appliances other than the car, and this could have been loaded in the ordinary way, without the platform. The injured knew this; had assisted in loading ties on a pre-vious occasion; saw the platform, and how it was con-structed; saw that it was wet and muddy; must have known, or without inconvenience could have learned, that the planks were not nailed to the ties; and, with-out making any objection whatever to the contrivance, or the manner of loading the car, voluntarily, with the

rest of the workmen, used the platform. After having so used it for a period of about two hours he slipped, fell, and was temporarily injured, but not severely. As to the fistula on his neck, the principal injury of which he complains, there appears to be no evidence to show that it was caused by or resulted from the accident— nothing to connect it with the accident. The injured himself said: "This condition of my throat developed something like two months after the original swelling and discoloration had gone away." If, under such facts and circumstances as are disclosed by this record, an employer would be liable to an employee in damages, it would seem difficult to conceive of a case of accidental injury where the employer would not be liable. That this is one of those unfortunate accidents for which there is no responsibility on the part of the employer, we entertain no doubt. It is clearly a case of an assumed risk incident to the employment.

We are aware of the general rule that, where a master employs a servant, he must exercise ordinary care to furnish the servant a reasonably safe place in which to perform the service, and a failure to do so will render the master liable for any injury to the servant resulting from such failure; but in this case we can perceive no violation of the rule that can avail the respondent, who, we have a right to assume, in the absence of evidence to the contrary, was a man of average understanding and knowledge of things about him. We cannot say from the proof that the place was not reasonably safe, but if it was not—if it was dangerous—the danger was open and obvious, and the employee could easily observe it, and had ample opportunity to discover it. Whatever hazard was connected with the loading of the ties was equally open and obvious to the employee as to the employer, if not more so; and, if there was anything unsafe about the platform, the exercise of ordinary care would have revealed it to the employe. He having voluntarily engaged in such service, concurring in the use of the contrivance, observing its construction

and temporary character, and, as a man of ordinary understanding and knowledge, aware of the dangers incident to the employment, and having, of his own volition, undertaken to perform the service in that way, must be held to have assumed the ordinary risks of injury incident to that service, including the risk of the injury in question, and cannot now be heard to complain. When in such case the servant assents "to occupy the place prepared for him, and incur the dangers to which he will be exposed thereby, having sufficient intelligence and knowledge to enable him to comprehend them, it is not a question whether such a place might, with reasonable care, and by a reasonable expense, have been made safe. His assent has dispensed with the performance on the part of the master of the duty to make it so. Having consented to serve in the way and manner in which the business was being conducted, he has no proper ground of complaint, even if reasonable precautions have been neglected." Sullivan v. India M. Co., 113 Mass. 396; Cooley on Torts, 634-636; Higgins v. Railroad, 26 Utah 165, 72 Pac. 690; Christienson v. Railroad, 27 Utah 132, 74 Pac. 876; Lovejoy v. Railroad, 125 Mass. 79, 28 Am. Rep. 206; Baker v. Paving Company (C. C.), 92 Fed. 117; Sweeney v. Envelope Co., 101 N. Y. 520, 5 N. E. 358, 54 Am. Rep. 722; McMillan v. Spider Lake S. M. & L. Co., 115 Wis. 332, 91 N. W. 979, 60 L. R. A. 589, 95 Am. St. Rep. 947; Williams v. Railroad, 116 N. Y. 628, 22 N. E. 1117; Tuttle v. Railroad, 122 U. S. 189, 7 Sup. Ct. 1166, 30 L. Ed. 1114

We are of the opinion that the court erred in refusing to charge the jury as requested, and, having concluded that no right of recovery exists in this case, it becomes unnecessary to decide the other questions presented.

The case is reversed, with costs, and remanded to the court below for further proceedings in accordance herewith. It is so ordered.

McCARTY, J. (concurring).—The vital question in this case is, did the master furnish respondent a reasonably safe place in which to perform the work required of him? · The record shows that the platform, and the runway of planks leading to it, were suitable for the purposes for which they were designed. In carrying the ties from where they were ricked or piled on the ground to the car in which they were being loaded, the plaintiff and other employes who were loading ties with him would pass up the runway onto the platform, and then turn at right angles and place the ties onto the car. At the time the accident occurred, plaintiff was standing on the plank which formed the runway, and was in the act of pushing a tie into the car, when the plank slipped, and he fell partly on the platform and partly on the ground. Had he stepped off the runway onto the platform before loading the tie, the accident, in all probability, would not have happened. While it is a duty the master owes to his servant to furnish him with a reasonably safe place in which to perform his work, the master is not bound to anticipate and guard against every conceivable kind of accident or misfortune that might occur. The appellant in this case was only required to use that degree of care and diligence in the construction of the runway and platform that a reasonably cautious and prudent man, understanding the dangers and hazards of the employment, would use under the same or like circumstances. The master cannot be expected, nor is he required, to anticipate and guard against every conceivable kind of accident and misfortune that might happen to the servant in the performance of the work, yet, if the respondent can be permitted to recover in this case, it would be difficult to conceive of a set of circumstances under which a master would not be liable to his servant for injuries sustained because of an accident to the servant while in the performance of the work required of him. The platform and runway were simple devices, temporary in character, and plainly observable; and to me it is incompre-

Dunn v. Railroad.

hensible how it was possible for respondent to go up this runway and onto the platform every few minutes· for a space of two hours, and not become aware of the. nature and character of their construction. In fact, respondent testified quite elaborately respecting the character of the platform and the planks used as a runway, and he did not·even venture the statement that he was ignorant of the fact that the planks were not nailed or otherwise fastened to the platform. I am decidedly of the opinion that the fall which respondent alleges was the cause of the injuries was purely accidental, and that the evidence does not even tend to show negligence on the part of appellant in the construction and maintenance of the platform and runway under consideration. The peremptory instruction asked for by appellant, directing a verdict in its favor, should have been given, as the respondent wholly failed to establish a case which entitled him to recover. I therefore concur in the judgment of reversal.

STRAUP, J. (dissenting).—I cannot concur in the opinion of the Chief Justice. I do not agree with the statement in the opinion that the platform was constructed "by the men who were to load the car, for their own convenience, out of material not furnished by the company for said purpose. It was only a temporary thing of their own invention to enable them to perform their work more easily." The record, without conflict, shows that the platform was constructed under the immediate and personal direction of appellant's foreman, and for the purpose of enabling the men to load the ties. This foreman had charge of the crew with which plaintiff was a member, had direct charge and supervision over the work then being prosecuted, directed and controlled the manner of its performance, and hired and discharged the men. His authority to do these things is not questioned. By reason of sections 1342, 1343, Rev. St. 1898, and the decisions of this court in Downey v. Min. Co., 24 Utah, 431, 68 Pac. 414, 91 Am.

St. Rep. 798, and Jenkins v. Min. Co., 24 Utah, 513, 68
Pac. 845, the said foreman was not a fellow servant with
plaintiff, but a vice principal of appellant. Because the
planks with which the platform was constructed were
originally furnished and designed for the purpose of
a crossing could make no difference, inasmuch as the
foreman was a vice principal, and ordered and directed
that the platform be constructed with the said material.
If the said material was not suited and adapted for the
purposes of the said platform, his negligence in direct-
ing and ordering it to be used for such purposes would
be all the more culpable. The platform being thus con-
structed under the management and direction of the
foreman, it then became and it was a place or an appli-
ance furnished and provided by the appellant. And so
far as the plaintiff is concerned, it matters not where
or by what means the foreman obtained the material
with which he constructed it.. The question then pre-
sented is, should the foreman, in the exercise of ordi-
nary care, considering the purpose for which the plat-
form was intended and expected to be used, have antic-
ipated that the planks were liable to, and probably
would, slip, from which injury would result, and there-
fore should have nailed the planks, or otherwise
guarded against their slipping? This question, I think,
under all the circumstances of the case, was one of fact
for the jury, which was properly submitted to them
under instructions fully regarding the rights of the de-
fendant. The court at length charged the jury that the
defendant was not an insurer of the safety of its appli-
ances or place of work, nor was it required to use ex-
traordinary care, but that its duty was simply to exer-
cise ordinary care to furnish a reasonably safe place,
and, if such was done, its full duty was discharged,
even though the place proved to be not reasonably safe
or adequate, and that the happening of the injury, or
the fact that the place or method furnished was unsafe,
raised no presumption of negligence, and was not evi-
dence thereof; that defendant was not liable for an in-

jury, resulting from accident, but was liable only for an injury occasioned from its negligence, and that ought to have been foreseen in the light of the attending circumstances. Nor is the fact that the platform was a temporary affair a controlling one, or at all a dividing line, when the question becomes one of fact or of law. It has but to do with the amount of care that should have been exercised in the premises, and, of course, to be considered by the jury in determining the question. The opinion further states that after plaintiff had used the platform for a period of about two hours he "slipped, fell," and was injured. There was a conflict in the evidence as to whether the plank slipped. Plaintiff says in positive terms one of the planks did slip as he was upon it, and about to lift or push a tie upon the car, thereby causing him to fall, from which he claimed he sustained injury. The foreman as positively asserted that the plank did not slip at all; that the plaintiff merely slipped. But in considering a motion to direct a verdict, we must consider that evidence which is most favorable to the party against whom the motion is made.

The further question is did the plaintiff assume the risk? The effect of the opinion is that plaintiff assumed not only the usual and ordinary risks incident to his business or employment, and of plainly observable and obvious defects, but also those which he "could have learned without inconvenience," and those which in the "exercise of ordinary care would have been revealed" to him. The lower court took substantially the same view, and so charged the jury. The trial court charged: "If, therefore, you find from the evidence in this case that the plaintiff's injuries, if any, were occasioned as the result of an accident that was one of the ordinary risks of the business in which the plaintiff was engaged at the time and place of receiving such injury, or was the result of a risk or danger which was known to him, or which was open and obvious, or which by the exercise of ordinary care upon the part of the plaintiff

would have been known to him, then the court charges you'' that plaintiff cannot recover. It seems, therefore, by the verdict, all those issues have been found in favor of the plaintiff. And when the opinion states that the plaintiff ''must have known'' of the defect in question, I think it is against the clear finding of the jury. I think the charge of the trial court upon this question and the opinion of the Chief Justice state the law more favorably to the defendant than it has a right to ask. Contributory negligence is confounded with that of assumed risk. Mr. Justice Day, in delivering the opinion of the court, well observed: ''The charge of the court upon the assumption of risk was more favorable to the plaintiff in error than the law required, as it exonerated the railroad company from fault if, in the exercise of ordinary care, McDade might have discovered the danger. Upon this question the true test is not in the exercise of care to discover dangers, but whether the defect is known or plainly observable by the employe. Railroad Co. v. McDade, 191 U. S. 64, 24 Sup. Ct. 24, 48 L. Ed. 96. The rule is also well stated wherein it is said that the employe has the right to proceed to use appliances without stopping to investigate their sufficiency or soundness, unless ''the defect is so apparent as to convey to him knowledge of its unsafe and dangerous condition upon his approach without investigation. He is not bound to search for defects, or to test the appliance in advance of using it.'' Bailey's Personal Injuries, section 809; Railroad v. Pearcy, 128 Ind. 197, 27 N. E. 479. In the McDade Case, supra, it was also observed: ''The question of assumption of risk is quite apart from that of contributory negligence. The servant has the right to assume that the master has used due diligence to provide suitable appliances in the operation of his business, and he doesn't assume the risk of the employer's negligence in performing such duties. The employe is not obliged to pass judgment upon the employer's methods of transacting his business, but may assume that rea-

sonable care will be used in furnishing the appliances necessary for its operation. This rule is subject to the exception that where the defect is known to the employe, or is so patent as to be readily observed by him, he cannot continue to use the defective apparatus, in the face of knowledge, and without objection, without assuming the hazards incident to such a situation. In other words, if he knows of the defect, or it is so plainly observable that he might be presumed to know of it, and continues in the master's employ without objection, he is taken to have made his election to continue in the employ of the master notwithstanding the defect, and in such case cannot recover.'' I think these authorities announce the correct rule. And when this rule is applied to the facts in this case it cannot be said the fact as to the unnailed or unfastened plank was so obvious and patent that it should be said it was readily observed by plaintiff, and he is presumed to have known it, but such question was also one of fact for determination by the jury. Here it must be remembered that the plaintiff had nothing whatever to do with the construction of the platform, nor was he about the place at the time of its being constructed. When he arrived at the place to begin his work, the platform had already been constructed, and was being used by the men in the loading of ties under the management and direction of the foreman. He worked there about two hours before his injury. It had rained, and was muddy, and mud had been tracked onto the planks, partially covering them. The authorities say he was not required to investigate the platform to see whether it was safe, but he had a right to assume that the master had used due diligence and care in this respect. He was not obliged to pass judgment upon the method or manner of performing the work, nor was he required to investigate the sufficiency or soundness of the platform, for he had the right to assume that reasonable care was used in that regard. And if it was not done, he cannot be held to have assumed the risk thereof,

unless, of course, the defect was so apparent and obvious as to readily convey to him knowledge of its unsafe and dangerous condition upon his approach without investigation, and whilst in the ordinary performance of his work, without looking and searching for defects. To hold otherwise is to say the servant assumes the negligence of his employer, which this court has said he does not do. Hill v. Railroad, 23 Utah, 94, 63 Pac. 814; Pool v. Railroad, 20 Utah, 210, 58 Pac. 326.

Stress is laid upon the fact that plaintiff knew of the existence of the platform, and that it was observed by him. Of course, that must be conceded; but the question is, was the fact that the planks were unnailed and unfastened plainly observable by him? While it is shown he observed and knew that one end of the planks rested upon the ground, and the other upon ties laid between the rails of the railroad track, there is nothing in the evidence to show that he knew that the planks were unnailed or unfastened or loose, or that he knew they at any time swayed or gave way, prior to the accident, or that prior thereto he had any knowledge or notice whatsoever of the unfastened or loose condition of the planks. If we say plaintiff assumed the risk of such defect, we are obliged to say so not because he had any actual knowledge thereof, but solely because such fact was so open and so readily observed that we, as matter of law, should say that he is presumed to have known thereof, and therefore did know. When we do that, I think we are speculating with the facts, and are invading the province of the jury. For the proposition is not so clear to me whereby I can say that all reasonable minds, when considering the question, must come to the same conclusion. That the question of assumed risk in this case was one of fact is amply supported by the following authorities: Faulkner v. Mining Co., 23 Utah, 437, 66 Pac. 799; Hill v. Railroad, 23 Utah, 94, 63 Pac. 814; Pool v. Railroad, 20 Utah, 210, 58 Pac. 326; Miller v. Mining Co., 18 Utah, 358, 55 Pac. 58; Boyle v. Railroad, 25 Utah,

420, 71 Pac. 988; and other cases from this court cited in the above cases.

But still a further view might be taken of the matter. Supposing it might be said that the plaintiff knew that the planks were unnailed—h̬e not being obliged to pass judgment upon the employer's method of construction of the platform, but having the right to assume that reasonable care had been exercised in this regard—would he not have a right to conclude, though the planks were not nailed, nevertheless the platform was reasonably safe, and could be used with ordinary safety in the prosecution of the said work? The Chief Justice, in writing the opinion in the case of Mangum v. Mining Co., 15 Utah, 534, 50 Pac. 834, used the following language: "Where an employee has knowledge of defects in machinery used in his employment, and the defects are not so dangerous as to threaten immediate injury, or the danger is not such as to be reasonably apprehended by him, his continuance in the service will not defeat a recovery for injuries resulting from said defects. If, however, the defects are so obviously and immediately dangerous that a person of ordinary prudence and precaution would refuse to use the machinery, then, if the servant continues its use, he assumes the risk. We think it was a question for the jury to determine whether, under all the circumstances in evidence in this case, the employee by continuing in his employment with knowledge of the defects, assumed the risk of the injury which he sustained." If we apply this principle of law to this case, I cannot see how it can be said that plaintiff assumed the risk here, as matter of law.

Much stress is laid in appellant's brief, and some in the opinion, that the principal injury to plaintiff had no connection with, and was not caused by, the accident. Some evidence is quoted to show that the injury was a mere temporary one. I do not see under what assignment of error this matter can be reviewed. There was no objection made at all when the evidence

was introduced showing the condition of the plaintiff's throat—his principal injury. There was no motion made to strike it out after it was introduced. There was no request asked whereby it was or should be eliminated from the consideration of the jury. There was no exception taken to the charge of the court on this subject. The nearest assignment that approaches it is the one that the court should have directed a verdict. But I take it the court cannot direct a verdict merely because the injury was temporary and not permanent. However, I think there is evidence in the record from which it may be said that plaintiff's condition of the throat was due to his injuries received at the time of the accident, and that it is of a permanent nature. It appears from plaintiff's testimony that when he fell he struck his chin on a tie or on a bumper of the car. He and other witnesses said that his neck below the chin was swollen—some said as large as a fist—and discolored. Plaintiff said this swelling and discoloration disappeared from his neck, during which time he had been to see a Dr. Taylor, the company's doctor. Then he said: "Not long after I quit going to see Dr. Taylor, my neck swelled up quite large, and then the swelling disappeared, and then, about six weeks after the accident, I first noticed this sore develop on my throat. The sore came some little time before it commenced to discharge. This condition of my throat developed something like two months after the original swelling and discoloration had gone away." There was no dispute but what the plaintiff had a running sore near what is termed the "Adam's apple." The physicians upon the part of the plaintiff testified that the pus discharged at the Adam's apple was due either to the diseased condition of the bone at the base of the tongue, or glands in the mouth or throat. The fistula spoken of is nothing more, so to speak, than a mere drain pipe which nature had provided for carrying away the pus and poisonous matter created from the diseased bone or affected glands. While physicians

stated that a surgical operation would cure the fistula on his throat, yet other physicians stated that the plaintiff "has an enlarged gland and a running sore on his throat. The glands of his mouth are inflamed and enlarged. I think there is a chronic condition of the throat that cannot be cured nor improved." "I think that, even if this fistula was cleared up and cured, that the glandular trouble would still exist. I am certain that the gland cannot be cured. I am not certain about the rest." Dr. Conroy, the witness quoted by the Chief Justice, also stated: "The probabilities of a cure by an operation would depend upon where the fistula runs to, and what would have to be removed." The physicians upon the part of the appellant claimed that the plaintiff's throat condition and the discharge were due to catarrhal trouble, which was denied by the plaintiff and his witnesses. Taking the testimony of plaintiff's physicians, there seems to be evidence that the diseased condition of the bone or affected glands is incurable, and therefore permanent. It was then for the jury to say whether that condition was traceable to the injury received at the time of the accident. Plaintiff had testified that prior to his accident he was healthy and had no throat or catarrhal trouble whatever. The jury may well have come to the conclusion that the diseased condition of the bone or glands was due to the violence or injury inflicted upon the plaintiff at the time of the accident, and that, though the swelling and surface discoloration of the throat had disappeared, still there would be no discharge from the said diseased condition of bone or glands until about the time it actually did appear—six or eight weeks after the accident. May the bone at the base of the tongue, or the glands in the mouth or throat, become diseased or affected from violence, and, if so, may pus gather and be discharged therefrom, and how soon after the infliction of violence may that be expected to occur, are not at all matters of law. These

things are mere questions of fact, depending upon a variety of conditions and circumstances.

My conclusion is, therefore, that this judgment ought to be affirmed.